William Cor
P.O. Box 1248
Saratoga, WY 82331
(307) 220-5307





FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2016 APR -5 PM 2:00
STEPHAN HARRIS, CLERK
CHEYENNE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WILLIAM COR,<br>   Petitioner, *pro se*,<br><br>vs.<br><br>SINCLAIR SERVICES COMPANY,<br>SINCLAIR WYOMING REFINING<br>COMPANY, including RAYMOND<br>HANSEN, and JAMES LARSCHEID,<br>Individually, and Acting in Their<br>Official Capacities, and Others to be<br>Named Later;<br>   Respondents. | CASE NO.: 16-cv-64-S<br><br>**COMPLAINT AND PETITION**<br>**FOR INJUNCTION, RESTITUTION**<br>**AND DAMAGES**<br><br>**JURY DEMAND** |

Petitioner William Cor, for this Complaint against Respondents, alleges and states as follows:

## I.  INTRODUCTION

This is a suit for relief, injunction and damages arising out of Petitioner's wrongful termination from employment as a project engineer at a Sinclair refinery, while resisting fraud, breaches of contract, and denial of equal opportunity in employment, based upon age, physical disability and retaliation.

## II. JURISDICTION

1. This Court has subject matter jurisdiction of this action pursuant to **42 U.S. Code § 1981 (c), 42 U.S. Code § 1983, 42 U.S. Code § 1985 (3), 42 U.S. Code § 2000 (e)**, and, **42 U.S.C. § 12112**. As required by statute, Petitioner filed a complaint against Respondent Sinclair Wyoming Refining Company on February 3rd, 2016, with the Denver regional office of the Equal Employment Opportunity Commission (EEOC). That complaint is still pending investigation by the Wyoming Department of Workforce Services.

2. This Court also has supplemental jurisdiction under 28 **U.S.C. § 1367 (a),** over all other claims, that are so related to claims in the action above that they form part of the same case or controversy under Article III of the United States Constitution.

## III. VENUE

3. Venue is proper in this district pursuant to 28 **U.S.C. § 1391 (c)**, in that the complaint arose in, and Petitioner resides in, this District.

## IV. PARTIES

4. Petitioner William Cor is a natural born US citizen, living in Encampment, Carbon County, Wyoming, with his family of seven individuals, since early 2014, and was employed by Respondent Sinclair Wyoming Refining Company as a mechanical project engineer, from March 2014 until January 13, 2016. Petitioner Siwas born and raised in Laramie, Wyoming. He holds a bachelor's degree in mechanical engineering from the University of Wyoming, has been a licensed professional engineer in Wyoming since 1981, and has nearly forty years of engineering experience. He has also held a national security clearance ("Q" clearance) related to his past employment, meaning that his personal background has been extensively investigated and vetted.

5. Respondent Sinclair Services Company is a privately held corporation, with headquarters in Salt Lake City, Utah. The company may be incorporated under the laws of the state of Missouri. The company businesses include oil refining, pipelines, trucking, service stations, motels and resorts, located in many states.

6. Respondent Sinclair Wyoming Refining Company is a subsidiary of Sinclair Services Company, with principal operations in Sinclair and Casper, Wyoming. It is headquartered in Salt Lake City, Utah.

7. Respondents James Larscheid and Raymond Hansen were William Cor's first and second line engineering supervisors at Sinclair Wyoming Refining Company, for the entire time of his employment at the Sinclair, Wyoming refinery. Subject to revelations that may come out of the discovery phase of this action, additional individual respondents may be named in their official capacities with the organization.

## V.   FACTS OF THE PETITION AND COMPLAINT

8. In early 2014, William Cor was recruited by James Larscheid from Tennessee, to return to his native Wyoming, and accept a mechanical project engineering position at the Sinclair refinery, at an annual salary of $115,000, and eligibility for Sinclair's employee bonus program for that year on a prorated basis. He was hired to replace another mechanical engineer, who was recently promoted to lead Sinclair's inspection program. Ray Hansen was Cor's second level supervisor, and reported to Steve Sondergard, the Sinclair plant manager. Cor started work on March 3rd, 2014, and assumed management for several small capital projects, in various stages of development. In addition to small capital projects, Larscheid's group also provided engineering support for periodic plant turnaround activities. Project managers were responsible for all phases of work, from inception through construction, and restoration of production activity.

9. Sinclair handled its cost accounting on a cash basis, unlike most organizations of its size, such that costs were not recorded until payment for goods or services was actually received. Pending transactions had no accounts receivable or accounts payable.

10. Sinclair had a process for project authorizations for expenditure (AFE), both for initial and supplemental funding. Sinclair also budgeted some capital projects prior to AFEs, and many funded and unfunded projects were allowed to proceed in design using a general design account, under the control of Larscheid. Whether a budgeted or approved AFE project had design services charged to the general design account was not predictable by the project managers. Sinclair policy was to request advance project funding supplements prior to actual cost overruns greater than 10% of the final cost.

11. In the spring of 2014, Cor had projects in need of additional design resources, beyond the capacity of the other contract engineering firms performing services at

Sinclair at the time. Larscheid and another project engineer in his group introduced Cor to Matt Freezer, who had recently formed a design group based in Denver, called Freezer Integration. Freezer had apparently done work for Larscheid and Sinclair in the past, as part of another design firm. Cor was given to understand that Freezer's group was majority owned by a qualified minority, and Sinclair's contracting department soon qualified Freezer to perform design services for Sinclair projects. As Cor was new to the group, most of the new work contracted to Freezer involved his assigned projects.

12.  Through the end of 2014, work on Cor's assigned projects, including those designed by Freezer appeared to go well. He was given an above average performance review by Larscheid, and annual salary for 2015 raised to $120,000. Cor was awarded his prorated share of company bonus in early 2015, and Larscheid also entered into a written agreement with him for up to a 25% bonus through the end of 2015.

13.  Prior to and during 2014, there were other Sinclair project engineers and other design firms working for Sinclair, that experienced severe project cost overruns, in the hundreds of thousands and even millions of dollars in excess of the AFE. These cost overruns became apparent at or near completion, and advance supplements had not been requested. There were no adverse consequences for these instances for either the project managers or the design firms associated with them, but apparently upper Sinclair management was very critical of Hansen and Larscheid for failing to control the final costs.

14.  In early 2015, Cor had a relatively minor pump replacement project for the ALKY facility, that had languished for years with the replacement pumps exposed to the elements and damaged by corrosion. Cor got an approved AFE to make the replacements for $140,000, and hired a Louisiana based design firm to design the work. The design cost was lumped into Larscheid's general design account, and to ensure the work would be accomplished, Cor arranged to have the project included within the scope of a turnaround for that facility in the coming summer months. Soon after obtaining the AFE, but before much cost had been committed for the project, Cor realized that a supplement would be required for special new pump foundations. He requested a supplement for $40,000 in early May, 2015.

15.  In mid-May, 2015, upper Sinclair management in Salt Lake City, scheduled a large meeting at the refinery with all or most of Hansen's and Larscheid's groups required to attend (about 20 to 30 engineers). The topic and agenda for the meeting was not disclosed in advance to the attendees. Cor was among those required to attend. At this time, the engineering staff for Hansen and Larscheid had been heavily tasked to support an approaching turnaround effort for the refinery, the largest of its kind in many years. Regular project work priorities were lowered to accommodate performing this support.

16. The scheduled late May meeting was conducted by Paul Moot, of the Sinclair corporate office. Moot opened the meeting with a very inaccurate summary of Cor's project described in Item 14 above, and cited it as a glaring example of a general failure to control project costs. In doing so, he neglected to discuss the more glaring and truly overrun project costs by others in the recent past. There was no opportunity to discuss the fairness or truth of Moot's criticisms, because Ray Hansen immediately stood up to reinforce Moot's concerns, and aggravated the discussion by repeatedly stating that his job was on the line. This statement was a clear implication that the employment of any or all of Hansen's subordinates were also in jeopardy. The remainder of the meeting was directed to a discussion of possible options for implementing new processes, to control costs better in the future. The next day, Cor objected to Larscheid about the tone and inaccuracies by Moot and Hansen. Larscheid replied that it was imperative to support the approaching plant turnaround for the time being, and that it was hoped that new processes would prevent similar circumstances. Cor's supplemental funding was approved a few days later, and the project was completed over the summer, without any actual costs over the amount approved, and no adverse personnel actions were taken at that time. Larscheid did direct his whole group to continue working in support of the approaching turnaround, including unpaid work for after hours and weekends.

17. On June 18th, 2015, Cor awoke with symptoms of partial loss of feeling on his left side, which was later diagnosed on June 23rd as a minor stroke. Never-the-less, Cor reported for work and served to assist the turnaround effort at Sinclair on that day and the days ahead.

18. On the morning of June 22nd, Cor was asked by fellow project engineer Dan Howell, to perform a post construction safety review for one of Howell's projects, so that he could leave to close on a house purchase. This review needed to be performed quickly, so that the unit could be returned to useful service. Cor agreed, and on his way to the site on a company bicycle, he collided with an unseen obstruction at ground level, and badly broke his left leg, below the knee. This injury was immediately classified as workplace accident, and the timing was unfortunate because it came shortly after the company was celebrating three million man-hours of work without a lost time injury. Cor later reported to Larscheid and others, in a telephone interview about the accident, that a contributing factor was the pressure unfairly placed on the engineering staff by Sinclair management. After returning to work part time in August, Cor repeated in writing this contributing factor for the accident report to management.

19. While Cor was away from work to recover from his injuries, a period of about six weeks, until early August, 2015, his projects were not reassigned and design work on

16. The scheduled late May meeting was conducted by Paul Moot, of the Sinclair corporate office. Moot opened the meeting with a very inaccurate summary of Cor's project described in Item 14 above, and cited it as a glaring example of a general failure to control project costs. In doing so, he neglected to discuss the more glaring and truly overrun project costs by others in the recent past. There was no opportunity to discuss the fairness or truth of Moot's criticisms, because Ray Hansen immediately stood up to reinforce Moot's concerns, and aggravated the discussion by repeatedly stating that his job was on the line. This statement was a clear implication that the employment of any or all of Hansen's subordinates were also in jeopardy. The remainder of the meeting was directed to a discussion of possible options for implementing new processes, to control costs better in the future. The next day, Cor objected to Larscheid about the tone and inaccuracies by Moot and Hansen. Larscheid replied that it was imperative to support the approaching plant turnaround for the time being, and that it was hoped that new processes would prevent similar circumstances. Cor's supplemental funding was approved a few days later, and the project was completed over the summer, without any actual costs over the amount approved, and no adverse personnel actions were taken at that time. Larscheid did direct his whole group to continue working in support of the approaching turnaround, including unpaid work for after hours and weekends.

17. On June 18th, 2015, Cor awoke with symptoms of partial loss of feeling on his left side, which was later diagnosed on June 23rd as a minor stroke. Never-the-less, Cor reported for work and served to assist the turnaround effort at Sinclair on that day and the days ahead.

18. On the morning of June 22nd, Cor was asked by fellow project engineer Dan Howell, to perform a post construction safety review for one of Howell's projects, so that he could leave to close on a house purchase. This review needed to be performed quickly, so that the unit could be returned to useful service. Cor agreed, and on his way to the site on a company bicycle, he collided with an unseen obstruction at ground level, and badly broke his left leg, below the knee. This injury was immediately classified as workplace accident, and the timing was unfortunate because it came shortly after the company was celebrating three million man-hours of work without a lost time injury. Cor later reported to Larscheid and others, in a telephone interview about the accident, that a contributing factor was the pressure unfairly placed on the engineering staff by Sinclair management. After returning to work part time in August, Cor repeated in writing this contributing factor for the accident report to management.

19. While Cor was away from work to recover from his injuries, a period of about six weeks, until early August, 2015, his projects were not reassigned and design work on

several projects continued by Freezer Integration, with approvals of their weekly invoices by Larscheid. Cor's support of the turnaround effort was reassigned to other project engineers during his absence, however. Cor was medically cleared to return to work on crutches in early August, 2015. It was clear that the rehabilitation would take months, and Cor requested Larscheid to authorize some work from home. This request was refused, and Cor was soon pressed to work longer hours to support the remaining turnaround effort, and to complete some projects with hard deadlines in October and November. Those deadlines were met, including one environmental project designed by Freezer Integration, installing new instrumentation on the refinery's flare systems.

20. In early December, 2015, Cor's attention became focused on completion of an approved project to add a lean amine heat exchanger near the Coker area. Freezer Integration had been working on the design for most of the year, and as their design neared completion, it became apparent that the project would need a funding supplement, based on a bid by a contractor (Brahma). Cor did submit a supplemental funding request through Larscheid and Hansen, but instead of supporting the supplemental funding to higher management, they found fault with Cor and Freezer Integration instead. This fault was based solely on the cost of design, which had been allocated to the group's general design account from the inception of the project. Larscheid and Hansen reallocated the design costs from the general account to the project account, cancelled the project, and argued that it should have cost much less to design and build due to relative simplicity, without looking at any of the design work product, nor commenting upon any of the prior design review process.

21. Also in late December, 2015, Larscheid disclosed to his group that the general design account for the year had exceeded its budget by several million dollars. One of the projects with a design overrun, a Sulphur tank replacement for the Coker area, was reassigned by Larscheid from Dave Fairbanks to Cor, and the design costs reallocated from the general design fund to the project. The design work was far from complete and had cost nearly $500,000, but there were no adverse consequences for the overrun for either Fairbanks or the Louisiana design firm (ReCon).

22. Just before the end of the year, in December 2015, Larscheid and Hansen reallocated more design costs from the general fund to two of Cor's projects. One project was an important rejuvenation of a very old cooling tower serving several of the plants in the refinery, and the other was for a replacement of corroded underground transfer piping between the ALKY Spheres tank storage. Freezer Integration had been performing design on each of the projects for over a year, invoicing Sinclair for their efforts on a weekly basis. Larscheid and Hansen would not communicate any longer with Freezer, and Larscheid falsely declared that the project designs were not finished and he did not

know when they would be finished. Freezer's work was ordered halted on these projects, and the current invoices not paid.

23. When Cor objected to Hansen that Freezer was being unfairly singled out for scapegoating, that the work was more complete than Larschied had indicated, that the design costs were reasonable, that the design reviews had gone very well, that equipment was purchased and a contractor (Brahma) was beginning material purchase and fabrication, and that another design firm (Worley Parsons) was requesting access to Freezer's design product on the spheres project for some related improvements, Hansen insisted that it should all have been considered as more simple projects and cost much less to design. Hansen then directed all work by Freezer Integration to be stopped, and that they would not be allowed to do any more work for Sinclair. When Cor asked to appeal this action to higher management, Hansen directed him to schedule a meeting for January 12th, 2016, with the plant manager, Hansen and Larscheid.

24. By early January, 2016, Cor was still recuperating from his injuries the previous year, and hampered by an inability to run, jump, climb ladders, navigate long flights of stairs, or carry heavy loads. He still had a certain lack of feeling in several fingers of the left hand due to the stroke. Sinclair managers were well aware of the lengthy period of recovery, and the extended lack of full mobility and dexterity.

25. On January 12th, 2016, Cor did meet with Hansen and Larscheid in Larscheid's office, but the plant manager (Steve Sondergard) did not attend. Hansen was not persuaded by any of Cor's reasoning, repeated his frustration that project costs were out of control, that there would be consequences for engineers who did not control project costs, repeated the contention that Freezer had not worked in a satisfactory manner because it should have been more simple, and then announced cancellation of Cor's two projects for the cooling tower and the spheres underground piping replacement. Cor asked again for an opportunity to appeal this to higher management, but this was refused, and Hansen walked out of the meeting. Cor attempted to reach Sondergard and various members of the corporate management (including several accountants), but received no responses that day.

26. On the morning of January 13, 2016, having heard nothing further and no responses from upper management, with several projects cancelled, and the rest of his projects at a standstill because of the lack of design support without Freezer or another design firm available, and suspecting that Hansen and Larscheid were willing to commit acts of fraud against the company in order to make accounts look better on the balance sheet than conditions of the plant merited in reality, Cor reasonably believed that he was about to be terminated. In an attempt to obtain the best separation terms that he could, he drafted and

delivered a resignation letter to Larscheid. In that letter, Cor requested a notice period that among other things would allow him time to line up another position, or time to qualify for Social Security when he turned 62 years old in April. He also asked for time to allow his retirement account matching contributions by the company to vest. Instead, Larscheid and the personnel director (Jodi Smith) terminated Cor without notice the same day, without any notice nor any written instrument of cause, allowing him only a few minutes to clear his office belongings before being escorted away from the premises.

27. Cor immediately filed for unemployment compensation because the termination was without cause or notice. The state of Wyoming determined that Cor was eligible for such benefits. Hansen and Larscheid appealed this determination, but Cor's eligibility was upheld (See, attached).

28. Cor sent a complaint against Sinclair to the EEOC branch office in Denver Colorado, on February 3rd, 2016. The EEOC referred the complaint to the state of Wyoming. The Wyoming Department of Workforce Services has drafted a charge against Sinclair on Cor's behalf, for wrongful termination due to age, disability and retaliation (See, attached).

## FIRST CAUSE OF ACTION
### (WRONGFUL DISCHARGE DUE TO AGE OR DISABILITY)
### 42 U.S. Code § 1981 (c), § 1983, and, § 12112

29. Plaintiff re-alleges paragraphs 1 through 28 above, as though fully set forth herein.

30. By terminating Petitioner on January 13th, 2016, without cause or notice, and knowing of his extended recovery due to injury at work, and of his approaching eligibility for retirement, Respondents made age and disability a factor in the discharge, and are liable for damages under the federal statutes for equal employment opportunity. Although the state of Wyoming has not yet issued notice of a permission to file suit against Sinclair, Petitioner is still entitled to claim this cause of action because it is directly related to other causes of action in this petition and complaint, and there is a good probability that Petitioner will be granted permission to sue in due course.

## SECOND CAUSE OF ACTION
### (WRONGFUL DISCHARGE FROM EMPLOYMENT FOR RETALIATION)
### 42 U.S. Code § 1985 (3), and, § 2000 (e),

31.  Petitioner re-alleges paragraphs 1 through 30 above, as though fully set forth herein.

32.  By terminating Petitioner on January 13th, 2016, without cause or notice, and knowing of his objection to the wrongful breach of contract and removal of a minority owned design provider to Sinclair, Respondents made retaliation a factor in the discharge, and are liable for damages under the federal statutes for equal employment opportunity. Although the state of Wyoming has not yet issued notice of a permission to file suit against Sinclair, Petitioner is still entitled to claim this cause of action because it is directly related to other causes of action in this petition and complaint, and there is a good probability that Petitioner will be granted permission to sue in due course.

### THIRD CAUSE OF ACTION
### (FRAUD IN THE INDUCEMENT)

33.  Petitioner re-alleges paragraphs 1 through 32 above, as though fully set forth herein.

34.  By eschewing the established Sinclair process for supplementing capital funding, declaring several of Petitioner's projects to be cancelled as no longer necessary, manipulating the accounting to suddenly transfer design costs from a badly overrun general design account to the Petitioner's project accounts at year's end, abandoning finished designs and declaring without review that the quality of work was unsatisfactory, accounting for purchased but uninstalled equipment as assets, and releasing unspent project funds to improve the company bottom line appearance, respondents Hansen, Larscheid, and perhaps other individuals to be named later, deliberately engaged in multiple frauds in the inducement. Respondents further concealed the fraud by preventing Petitioner from appealing their actions to upper company management, and terminating Petitioner without cause when he would not cooperate with their fraudulent actions.

### FOURTH CAUSE OF ACTION
### (FRAUD IN THE EXECUTION)

35.  Petitioner re-alleges paragraphs 1 through 34 above, as though fully set forth herein.

36. By deliberately committing the fraud in the inducement described in the third cause of action, respondents Hansen, Larscheid, and perhaps other individuals to be named later, willingly left important aged and decaying Sinclair plant systems in operation, with the hope that they could continue to be used well past their useful life. Respondents Hansen and Larscheid declared the design for the upgrades to be simple, singled out Petitioner for not achieving control of project costs, and terminated all further design work by Freezer Integration. The motive for these actions was to avoid upper management scrutiny and likely criticism for prospective project costs above the initial estimates, and resulted in several frauds in the execution, to the real detriment of the company's interests, to Freezer Integration, and to Petitioner.

### FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

37. Plaintiff re-alleges paragraphs 1 through 22 above, as though fully set forth herein.

38. By Respondent Sinclair (through Larscheid) entering into a signed written instrument in early 2015 with Petitioner, promising up to 25% of his annual base salary under Sinclair's salaried employee annual bonus program, and then not awarding any bonus after Petitioner satisfied his eligibility through service to Sinclair through the end of 2015, then terminating Petitioner on January 13th, 2015 without cause, Sinclair is liable for the full amount of the 2015 bonus due to breach of contract. A fair amount of the contract value given Petitioner's annual salary of $120,000/year, would be $30,000, and repeating for each passing year through retirement.

39. By Respondent Sinclair promising all salaried employees a matching contribution to their 401(k)) retirement accounts, of up to 6% of their annual base salary, subject to a vesting period, and then terminating Petitioner before his contributions could vest on January 13th, 2015, without cause, Sinclair is liable for the full amount of the matching retirement contribution due to breach of contract. A fair amount of the contract value would be the amount accumulated of $12,000 by Petitioner, and given his annual salary of $120,000/year, would be an additional $7,200 for 2016, and repeating for each passing year through retirement.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner and his family have been damaged considerably, and we pray for judgment as follows:

40. For an injunction to Respondent Sinclair, to restore Petitioner to his project management employment, with all rights, responsibilities, and opportunities for advancement, with compensation for all lost salary, bonuses, retirement fund, insurance and all other benefits, dating from the wrongful termination on January 13, 2016; or,

41. For actual and compensatory damages, including lost salary, bonuses, benefits through retirement, an amount fairly estimated at $ 2,000,000;

42. For punitive damages in an amount sufficient to punish Respondents and deter others from like conduct;

43. Prejudgment interest;

44. Court fees and legal costs of this suit; and,

45. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Please take notice that Petitioner demands trial by jury in this action.

Dated this __5th__ day of April, 2016.

By: _/s/ William L. Cor_

William Cor
Petitioner *Pro Se*
P.O. Box 1248
Saratoga, WY 82331